**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEAN R. ENGLEHART, ROBBIN L. ENGLEHART, H/W, *individually and on behalf of a class of similarly situated persons*, Plaintiffs, | : | |
| v. | : | No. 5:25-cv-6655 |
| WESTFIELD INSURANCE COMPANY, Defendant. | : | |

**O P I N I O N**

**Defendant's Motion to Dismiss in Part, ECF No. 13 – Granted in Part, Denied in Part**

**Joseph F. Leeson, Jr.** **September 22, 2026**
**United States District Judge**

## I. INTRODUCTION

This case arises following an automobile accident. Plaintiffs Dean and Robbin Englehart pursued underinsured motorist ("UIM") benefits through their insurer, Westfield Insurance Company ("Westfield"). Westfield did not offer the Engleharts benefits in response to their demand, maintaining that they received a settlement from the tortfeasor's insurance company that exceeded their policy limits. The Engleharts bring the present action for a declaratory judgment, breach of contract, bad faith, and loss of consortium. The Engleharts bring their declaratory judgment claim on behalf of themselves and the proposed class. Westfield moves to dismiss the declaratory judgment claim, the breach of contract claim to the extent it is based upon the theory that Westfield misapplied underinsured motorist (UIM) coverage as "gap" and not "excess," and the theory that Westfield breached the implied duty of good faith and fair dealing, and the statutory bad faith claim. In the alternative, Westfield also seeks to strike the class allegations in the declaratory judgment claim in Count I. For the following reasons, this

Court grants the Motion in part, but denies the Motion in part, pursuant to Fed. R. Civ. P. 12(b)(6).

## II. BACKGROUND

### A. Factual Background

The Engleharts were involved in an automobile accident on October 29, 2023, in Paradise Township, Lancaster County, Pennsylvania. *See* Am. Compl. ¶¶ 11, 14, ECF No. 11. Mr. Englehart was driving southbound on Belmont Road in a 2018 Dodge Caravan, when he approached the intersection with State Route 30 ("SR 30"). *See id.* Ms. Englehart was a passenger in the automobile. *See id.* ¶ 12. Mr. Englehart is a paraplegic, and the Dodge Caravan "had been modified to include hand controls and other necessary adaptive equipment." *Id.* ¶ 13.

The Engleharts had an insurance policy with Westfield that provided UIM "coverage in the amount of $100,000/$300,000 stacked for two (2) vehicles, resulting in $200,000 in available UIM benefits per" Englehart. *Id.* ¶ 41; *see also* Ex. A, ECF No. 11-2.

As the Engleharts' automobile entered the intersection, a tractor-trailer operated by Michael A. Miller (traveling westbound on SR 30), drove through a red traffic signal and collided with the Engleharts' vehicle. *See* Am. Compl. ¶ 14. Mr. Englehart "had a green traffic signal and the legal right-of-way to proceed through the intersection." *Id.* ¶ 15. "[S]ubsequent investigation revealed that [Miller] had an unobstructed view of the red traffic signal for at least six (6) seconds before the crash and was operating the tractor-trailer at speeds in excess of the posted speed limit." *Id.* ¶ 16.

Mr. Englehart "sustained a severe shock to the nerves and nervous system and severe and numerous bodily injuries including, but not limited to: fractures to the second and fourth metacarpals of the right hand, necessitating open reduction internal fixation surgery at those

locations;" bursitis in his right elbow; pain in the right hand, ring finger, small finger, and right elbow; weakness in his right hand; and other pain. *Id.* ¶ 22. Mr. Englehart was left "entirely disabled and unable to independently perform activities of daily living for an extended period of time." *Id.* ¶ 23. Ms. Englehart suffered pain in the abdomen, chest, left lateral knee, right shin, neck, back, and wrist, as well as abrasions to the right shoulder and left hip, muscle spasms, anxiety, depression, hematoma of the right clavicle, lower-level skin tear on the right leg, traumatic hematoma of the right lower leg, and other injuries. *See id.* ¶ 28. The Engleharts also lost their 2018 Dodge Caravan, Mr. Englehart's motorized power wheelchair, the wheelchair lift conversion equipment in the Dodge Caravan, and the hand controls in the Dodge Caravan. *See id.* ¶ 35.

The tractor trailer operated by Miller was insured by the Arch Insurance Company, which provided $1,000,000 in liability coverage. *See id.* ¶¶ 37–38. After the collision, Arch paid $135,000 to settle other bodily injury claims "asserted by individuals other than the plaintiffs[.]" *Id.* ¶ 39. Of the remaining $865,000, the insurer tendered $173,000 to Ms. Englehart and $692,000 to Mr. Englehart. *See id.* ¶ 43. On April 15, 2025, the Engleharts wrote to Westfield to advise of the tortfeasor's settlement offer and requested Westfield's consent to settle their claims. *See id.* ¶ 45; *see also* Ex. B, ECF No. 11-3. Westfield consented to waive subrogation and to the settlement with Arch Insurance on May 7, 2025. *See* Am. Compl. ¶ 46; *see also* Ex. C, ECF No. 11-4. In the same correspondence, Westfield's Claims Representative Cindy Norton requested that the Engleharts "forward the demand packages for Dean and Robbin Englehart." *Id.* The Engleharts provided Westfield with the requested demand packages on June 9, 2025. *See* Am. Compl. ¶ 47.

In a letter dated August 8, 2025, Norton acknowledged receipt of the Engleharts' demand packages. *See id.* ¶¶ 48–55; *see also* Ex. D at 1, ECF No. 11-5. Norton noted that Westfield "ha[d] reviewed the submitted materials, including medical records, employment documentation, and supporting exhibits." *Id.* She acknowledged Westfield's understanding that "liability offsets apply" in the amount of $692,000 for Mr. Englehart and $173,000 for Ms. Englehart, which Norton termed "liability credit[s]." Am. Compl. ¶ 55; *see also* Ex. D at 1. Norton added that, "[i]n accordance with Pennsylvania law, these credits are applied to reduce the available UIM coverage. As both credits meet or exceed the applicable UIM limit of $200,000 per person, no UIM benefit is payable under the terms of the Westfield policy." *Id.*

With regard to Mr. Englehart's claim, Norton wrote that "[t]he liability settlement of $692,000 sufficiently compensates for the injury sustained." Ex. D. at 1. The letter mentioned Mr. Englehart's injuries in detail. *See id.* With regard to Ms. Englehart's claim, Norton wrote that "the claimed losses—including emotional distress and lost earnings—are reasonably accounted for within the $173,000 liability credit previously received." *Id.* The letter also addressed Ms. Englehart's injuries. *See id.* at 2. Norton explained that "no further payment is due under the Westfield UIM coverage," but that "[s]hould additional documentation become available that [the Engleharts] believe materially affects our evaluation, we remain open to reviewing such information." *Id.*

**B. Procedural History**

On October 28, 2025, the Engleharts filed a Complaint against Westfield in the Philadelphia County Court of Common Pleas. *See* ECF No. 1-1. The Engleharts pleaded Counts I and III, which sought declaratory relief and statutory bad faith, respectively, as class claims. *See id.* ¶¶ 87–99, 145–163. The Engleharts pleaded Counts II and IV, alleging breach of contract

for both the Engleharts and loss of consortium for Ms. Englehart, respectively, as individual claims. *See id.* ¶¶ 100–144, 164–168. The Engleharts pleaded their claim for breach of contract under two theories: a breach of the express terms of Westfield's policy and a breach of the implied covenant of good faith and fair dealing (common-law bad faith).[1] *Compare id.* ¶¶ 100–125 *with* ¶¶ 126–144.

On November 24, 2025, Westfield removed this action to this Court based on diversity jurisdiction over the Engleharts' claims and supplemental jurisdiction over the class claims. *See* ECF No. 1. On December 1, 2025, Westfield moved to dismiss the Complaint in its entirety and, alternatively, to strike the Engleharts' class allegations. *See* ECF No. 8.

On December 18, 2025, the Engleharts filed an Amended Complaint in this Court. *See generally* Am. Compl. Similarly to the state court complaint, the Engleharts raised four claims. *See id.* Count I, pleaded as a class action on behalf of the Engleharts and the proposed class, is for declaratory relief. *See id.* ¶¶ 106–123. Count II is the Engleharts' claim for breach of contract for underinsured motorist (UIM) benefits, *see id.* ¶¶ 124–157, and breach of the implied duty of good faith and fair dealing, *see id.* ¶¶ 158–177. Count III is the Engleharts' claim for statutory bad faith against Westfield. *See id.* ¶¶ 178–196.[2] Count IV is Ms. Englehart's claim for loss of consortium. *See id.* ¶¶ 197–201. The Engleharts raise class allegations based upon "Westfield's application of liability credits against the UIM policy limits[,]" which they allege was

---

[1] The tort of breach of the implied duty of good faith and fair dealing is also called common law bad faith. *See Tubman v. USAA Cas. Ins. Co.*, 943 F. Supp. 2d 525, 529 (E.D. Pa. 2013).

[2] Some of the class allegations appear to be left in from the state court complaint, *see* Am. Compl. ¶¶ 190, 194, 195, but the Court construes the statutory bad faith claim to only apply to the Engleharts.

"unlawful." *Id.* ¶¶ 72–105. The Court then dismissed Westfield's first motion to dismiss as moot. *See* ECF No. 12.

On January 2, 2026, Westfield filed a Motion to Dismiss in Part the Amended Complaint, seeking to dismiss Count I (the declaratory judgment claim), the allegations that Westfield misapplied underinsured motorist (UIM) coverage as "gap" and not "excess," in violation of Pennsylvania law in Count II, and that Westfield breached the implied duty of good faith and fair dealing in Count II, and the statutory bad faith claim in Count III. *See generally* Mot., ECF No. 13; *see also* Mot. Mem., ECF No. 13-1. In the alternative, Westfield seeks to strike class allegations in Count I (the declaratory judgment claim). *See id.* Westfield acknowledged that it "[did] not challenge Count II to the extent it [wa]s based on a theory that Westfield owes [the Engleharts UIM benefits based on different views as to the valuation of their claim—a purported breach of the express terms of the policy[.]" Mot. Mem. 2 (citing Am. Compl. ¶¶ 49–53,140–146, 152). Westfield did not challenge the loss of consortium claim. *See* Mot. Mem. 2.

The Engleharts filed a Response in Opposition on January 16, 2026. *See* Resp., ECF No. 14. In it, the Engleharts note that they raise class allegations in their declaratory judgment claim, and they only seek certification under Federal Rule of Civil Procedure 23(b)(2), not Rule 23(b)(3). *See* Resp. Mem. 32, ECF No. 14-1. Westfield filed a Reply on January 23, 2026. *See* Reply, ECF No. 15. The Motion is ready for disposition.

## III. LEGAL STANDARDS

### A. Motion to Dismiss – Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir.

2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Phillips*, 515 F.3d at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Also, "a document integral to or explicitly relied upon in the complaint may be considered." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted).

The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B. Declaratory Judgment**

The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). A plaintiff's "complaint must meet two threshold requirements: (1) the complaint must satisfy the elements of a statute which confers subject matter jurisdiction to this Court . . . independent of the Declaratory Judgment Act; and (2) Plaintiffs' complaint must present a justiciable case or controversy." *Purshe Kaplan Sterling Invs., Inc. v. Neff*, No. 20-878, 2020 WL 5406040, at *2 (E.D. Pa. Sept. 9, 2020); *see also Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 351–352 (3d Cir. 1986) ("Every case brought under the Federal Declaratory Judgment Act still must fall within federal jurisdiction and present a justiciable issue. . . . In the statutory language of § 2201, the remedy may only be granted whenever there is an 'actual controversy' based upon independent jurisdictional grounds."). A district court's power to preside over declaratory judgment actions is discretionary, and in determining whether to exercise this discretion, courts consider the following:

> 1. A general policy of restraint when the same issues are pending in a state court;
> 2. An inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion; and
> 3. Avoidance of duplicative litigation.

*State Auto Ins. Cos. v. Summy*, 234 F.3d 131, 134 (3d Cir. 2000) (citation omitted).

The Third Circuit has provided a three-part test for determining whether a declaratory judgment action presents an actual controversy that is ripe for decision: "(1) the parties must have adverse legal interests; (2) the facts must be sufficiently concrete to allow for a conclusive legal judgment, and (3) the judgment must be useful to the parties." *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006).

**C. Breach of Contract – Review of Applicable Law**

A successful breach of contract claim has three elements: (1) the existence of a contract; (2) a breach of duty imposed by the contract; and (3) the plaintiff suffered damages as a result of

the breach. *See Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002). "To satisfy the first element—the existence of a contract itself—a party must plead enough facts to demonstrate (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *Abdul-Rahman v. Chase Home Fin. Co., LLC*, No. 13-5320, 2014 WL 3408564, at *2 (E.D. Pa. July 11, 2014) (quotation modified). "It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F. 2d 291, 298 (3d Cir. 1986).

**1. Gap vs. Excess Coverage**

The Pennsylvania Motor Vehicle Financial Responsibility Law (MVFRL) defines an underinsured motor vehicle as: "a motor vehicle for which the limits of available liability insurance and self-insurance are insufficient to pay losses and damages." 75 Pa. Cons. Stat. § 1702. The MVFRL is part of an "excess coverage" regime. *Erie Ins. Exch. v. Backmeier*, 287 A.3d 931, 942–943 (Pa. Super. Ct. 2022) (citing *Generette v. Donegal Mut. Ins. Co.*, 957 A.2d 1180, 1191 (Pa. 2008)). This is "because the definition [of an underinsured motorist] is framed in terms of the total of the insured's losses rather than the insured's own insurance coverage limits." *Generette*, 957 A.2d at 1191. "Under the excess coverage framework, a tortfeasor is underinsured if his policy coverage limits are less than the injured insured's actual losses, and the injured insured's coverage is 'excess' above the liability policy of the tortfeasor." *Gittelmacher v. Travelers Prop. Cas. Ins. Co.*, 664 F. Supp. 3d 605, 614 (E.D. Pa. 2023), *aff'd*, No. 23-1774, 2024 WL 4274460 (3d Cir. Sept. 24, 2024) (citing *Backmeier*, 287 A.3d at 942–943 (quoting *Generette*, 957 A.2d at 1186 n.12)). An injured insured in an excess coverage regime "will

recover first under the tortfeasor's policy up to the limit and then recover under [the insured's] own policy up to the lesser of [the insured's] coverage limits or the total amount of damages." *Gittelmacher*, 664 F. Supp. 3d at 614 (citing *Allwein v. Donegal Mut. Ins. Co.*, 671 A.2d 744, 747 (1996)). Reciprocally, in a gap coverage framework, "the tortfeasor is underinsured where his liability limits are less than the injured insured's own policy limit rather than her losses." *Gittelmacher*, 664 F. Supp. 3d at 615 (citation omitted). "The injured insured's own policy benefits fill the gap between the tortfeasor's liability limits and the injured person's liability limits—that is, the recovery from the tortfeasor's policy is deducted from the amount recoverable under the injured insured's UIM policy." *Id.* (citation omitted).

Take the following example, provided by the Pennsylvania Supreme Court (as cited by the Pennsylvania Superior Court):

> [By way of an example illustrating the distinction between excess and gap UIM coverages, s]uppose that an injured insured is legally entitled to damages of $100,000[.00 and] that the tortfeasor's liability insurance is $20,000[.00] and that the injured insured's UIM coverage limit is $50,000[.00]. Under excess UIM coverage, the injured insured's total recovery is $70,000[.00], with UIM coverage of $50,000[.00] being paid in addition to the amount the [injured] insured receives under [the tortfeasor's] liability coverage, $20,000[.00]. Under gap UIM coverage, the injured insured's total recovery is $50,000[.00], with the first $20,000[.00] coming from the tortfeasor's liability coverage and the remaining $30,000[.00], coming from the injured insured's UIM coverage, to fill in the gap between the tortfeasor's liability coverage and the injured insured's UIM coverage.

*Backmeier*, 287 A.3d at 943 (citing *Generette*, 957 A.2d at 1186 n.12 (citing *Pa. Nat'l Mut. Cas. Co. v. Black*, 916 A.2d 569, 583 n.1 (Pa. 2007) (Cappy, C.J. dissenting)).

**2. Implied Duty of Good Faith and Fair Dealing**

In Pennsylvania, the common law duty of good faith and fair dealing is implied in every contract. *See Excelsior Ins. Co. v. Incredibly Edible Delites*, No. 09–3198, 2009 WL 5092613, at *3 (E.D. Pa. Dec. 17, 2009). Pennsylvania courts define "the duty of good faith and fair dealing

as '[h]onesty in fact in the conduct or transaction concerned,' and have held that '[w]here a duty of good faith arises, it arises under the law of contracts, not under the law of torts.'" *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (citing *Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank*, 801 A.2d 1248, 1253 (Pa. Super. Ct. 2002) (internal quotation marks omitted)). Furthermore, "under Pennsylvania law, a 'claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim.'" *Burton*, 707 F.3d at 432 (citing *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super. Ct. 2008)). "Therefore, while Pennsylvania law generally recognizes a duty of good faith in the performance of contracts, this duty 'does not create independent substantive rights.'" *Burton*, 707 F.3d at 432 (citing *Commw. v. BASF Corp.*, No. 3127, 2001 WL 1807788, at *12 (Phila. Ct. Com. Pl. Mar. 15, 2001); *see also JHE, Inc. v. Se. Pa. Transp. Auth.*, No. 1790, 2002 WL 1018941, at *5 (Phila. Ct. Com. Pl. May 17, 2002) ("[T]he implied covenant of good faith does *not* allow for a claim separate and distinct from a breach of contract claim. Rather, a claim arising from a breach of the covenant of good faith must be prosecuted as a breach of contract claim, as the covenant does nothing more than imply certain obligations into the contract itself.") (emphasis in original)).

**D. Statutory Bad Faith – Review of Applicable Law**

"To recover on a bad faith claim, a claimant is required to show by clear and convincing evidence that: (1) the defendant insurer did not have a reasonable basis for denying the policy benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis when it denied the claim." *Camp v. N.J. Mfrs. Ins. Co.*, No. 16-1087, 2016 U.S. Dist. LEXIS 74496, at *9 (E.D. Pa. June 8, 2016). To state a claim for bad faith for an insurer's failure to pay a claim, "the plaintiff must allege an underlying element of self-interest or ill will." *O'Brien v. Liberty Mut. Ins.*, No. 21-01234, 2021 U.S. Dist. LEXIS 140495, at *5–6 (E.D. Pa. July 28, 2021).

"Mere negligence or bad judgment on the part of an insurer is not considered to be bad faith." *Id.* "Courts in this Circuit have routinely dismissed bad faith claims reciting only 'bare-bones' conclusory allegations that are not accompanied by factual allegations sufficient to raise the claims to a level of plausibility required to survive a Rule 12(b)(6) motion to dismiss." *Camp*, 2016 U.S. Dist. LEXIS 74496, at *11.

**E. Motion to Strike Class Allegations**

"Courts may, in rare instances, strike class allegations prior to a motion for class certification." *Bernstein v. Serv. Corp. Int'l*, No. 17-4960, 2018 WL 6413316, at *3 (E.D. Pa. Dec. 6, 2018) (citation omitted); *see also Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."). Yet, "district courts within the Third Circuit typically conclude that motions to strike class action allegations filed before plaintiffs move for class certification are premature." *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 284 F.R.D. 238, 244 (E.D. Pa. 2012) (citation omitted). Granting such a motion before class certification is appropriate "only where '[n]o amount of additional class discovery will alter th[e] conclusion' that the class is not maintainable." *Id.* (quoting *Thompson v. Merck & Co.*, No. 01-1004, 2004 WL 62710, at *2 (E.D. Pa. Jan. 6, 2004)); *see also Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 615 (E.D. Pa. 2015) (finding that courts should "only grant a motion to strike class allegations if class treatment is evidently inappropriate from the face of the complaint") (citation omitted). Courts disfavor motions to strike class allegations and consider them "a drastic remedy

to be resorted to only when required for the purposes of justice[.]" *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (citation omitted).

**F. Class Certification – Review of Applicable Law**

Class certification is governed by Rule 23(a)'s four prerequisites: numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a). Numerosity is a consideration of the judicial economy and requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 252–253 (3d Cir. 2016) (noting "judicial economy" as a core purpose of the numerosity prerequisite). Generally, joinder is presumed impracticable "when the potential number of class members exceeds forty." *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 896 (3d Cir. 2022). The second prerequisite, commonality, requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy commonality, each class member's claim "must depend upon a common contention" such that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]he typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998). The final prerequisite, adequacy of representation, requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Generally, this prerequisite considers "the competency of class counsel and conflicts of interest." *Gen. Tel. Co. of Sw. v. Falcon*, 457

U.S. 147, 158 n.13 (1982). "[T]he party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).

**G. Rule 23(b)(2) Classes**

Rule 23(b)(2) "class actions are 'limited to those class actions seeking primarily injunctive or corresponding declaratory relief.'" *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142 (3d Cir. 1998) (citing 1 *Newberg on Class Actions* § 4.11, at 4–39). "A [Rule 23(b)(2)] class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 165 (E.D. Pa. 2015) (citing Fed. R. Civ. P. 23(b)(2)). "A properly defined class is one that: (1) meets the requirements of Rule 23(a); (2) is sufficiently cohesive under Rule 23(b)(2) and [the Third Circuit's] guidance in *Barnes*, 161 F.3d at 143 [("While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive.")]; and (3) is capable of the type of description by a readily discernible, clear, and precise statement of the parameters defining the class[.]" *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015) (internal citations and quotations omitted). The cohesiveness requirement protects two interests: (1) protecting unnamed class members, who "are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action[;]" and (2) the manageability of the litigation, because otherwise, "little value would be gained in proceeding as a class action . . . if significant individual issues were to arise consistently." *Barnes*, 161 F.3d at 143 (citing *Santiago v. City of Phila.*, 72 F.R.D. 619, 628 (E.D. Pa. 1976)). To find a class cohesive, the court must

find that the "class's claims are common ones[,] and that adjudication of the case will not devolve into consideration of myriad individual issues." 2 *Newberg on Class Actions* § 4:34 (6th Ed. June 2026). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360 (emphasis in original).

## IV. ANALYSIS

First, Westfield seeks to strike the class allegations in Count I (the declaratory judgment claim), arguing that to the extent the Engleharts propose a class under Rule 23(b)(3), the proposed class is an unascertainable fail-safe class because it is defined by its own liability (i.e., whether Westfield misapplied coverage as gap rather than excess), and determining class membership would require individualized analysis, defeating predominance. *See* Mot. Mem. 32–35. Additionally, Westfield notes that if the Engleharts intend to propose a Rule 23(b)(2) class, they cannot establish cohesiveness. *See id.* at 36–38.

Second, Westfield asserts that the Engleharts' declaratory judgment claim is duplicative of its breach of contract claim because they both necessitate the adjudication of Westfield's alleged misapplication of benefits. *See id.* at 16–20. Furthermore, Westfield maintains that the declaratory judgment action improperly seeks to adjudicate past conduct, and also inappropriately seeks a declaration of Westfield's liability to the Engleharts. *See id.* at 13–16, 21–22.

Third, Westfield asserts that the Engleharts' breach of contract claim based upon allegations that Westfield misapplied liability as gap, not excess, fails because the Engleharts

failed to plausibly plead that Westfield applied UIM coverage as gap coverage rather than excess coverage. *See id.* at 22–25.

Fourth, Westfield asserts that the Engleharts fail to adequately plead breach of the implied duty of good faith and fair dealing, because a disagreement over claim valuation is insufficient to establish bad faith, and because the breach of the implied duty of good faith and fair dealing claim is identical to the Engleharts' statutory bad faith claim. *See id*. at 25–26.

Fifth, Westfield asserts that the Engleharts fail to plausibly plead statutory bad faith because there was no evidence to show Westfield's failure to investigate or evaluate the Engleharts' claims, or that Westfield knowingly or recklessly misapplied coverage as excess. *See id.* at 26–30.

The Court denies the Motion to Strike the class allegations, denies the Motion to Dismiss the declaratory judgment claim as to the proposed class but dismisses the Engleharts' declaratory judgment claim, does not dismiss the allegations of misapplication of policy but dismisses the breach of the implied duty of good faith and fair dealing claim in the breach of contract claim, and dismisses the statutory bad faith claim without prejudice.

**A. Class Allegations**

The Engleharts bring the declaratory judgment claim as a class action. The Engleharts do not specify what type of class they sought to bring. In their Response, the Engleharts maintain that "[t]he Amended Complaint limits the class claim in Count I to declaratory relief under Rule 23(b)(2)[,]" Resp. Mem. 32, to which the ascertainability requirement does not apply, *see Shelton*, 775 F.3d at 563 (holding that "ascertainability is not a requirement for certification of a [23](b)(2) class seeking only injunctive and declaratory relief"). Since the Engleharts did not specify the class definition and given that they now allege that they bring the proposed class

under Rule 23(b)(2), the Court considers the class as a Rule 23(b)(2) class. Upon review, the Engleharts plausibly allege cohesiveness, sufficient at the pleading stage. The Court thus denies the Motion to Strike Class Allegations.

**1. Cohesiveness**

To the extent that the Engleharts seek to bring a class under Rule 23(b)(2), the class is sufficiently cohesive to survive a motion to strike class allegations. The Engleharts define the proposed class as follows:

> All Pennsylvania insured who, within four (4) years preceding the filing of this action and continuing through the date of class certification, satisfy each of the following criteria: (a) who sustained injury in a motor vehicle accident in Pennsylvania; (b) who were the named insured or an injured under a policy issued by Westfield in the Commonwealth of Pennsylvania providing UIM coverage in accordance with the MVFRL; (c) who made claim for recovery of UIM benefits under Westfield policy; and (d) whose claim for recovery of UIM benefits was denied, in whole or in part, by Westfield's application of liability credits against the UIM policy limits rather than against the claimant's total damages.

Am. Compl. ¶ 75.

"A court should grant a motion to strike class allegations only if the inappropriateness of class treatment is evident from the face of the complaint and from incontrovertible facts." *In re Paulsboro Derailment Cases*, No. 12-7586, 2014 WL 1371712, at *3 (D.N.J. Apr. 8, 2014) (citing *Landsman & Funk PC v. Skinder–Strauss Assocs.*, 640 F.3d 72, 93 n.30 (3d Cir. 2011)). Here, the Court finds the allegations that Westfield improperly applied gap coverage, rather than excess coverage, in violation of Pennsylvania law, suffice to state a class claim. The Engleharts bring a proposed class of persons who faced the same conduct, again in violation of Pennsylvania law. At this early stage of the case, the Court cannot conclude that the

inappropriateness of class treatment is evident from the face of the Amended Complaint.[3] *See Niemczyk v. Pro Custom Solar LLC*, No. 19-7846, 2022 WL 884359, at *4 (D.N.J. Mar. 25, 2022) (denying a motion to strike class allegations because the allegations, on the face of the complaint, were not "facially deficient").

**B. Declaratory Judgment**

The Amended Complaint plausibly pleads a declaratory judgment claim as to the class, but not as to the Engleharts. The Engleharts (and the proposed class) seek a declaratory judgment that "policies issued by [] Westfield[] are required to apply underinsured motorist coverage in accordance with Pennsylvania law and may not be interpreted or applied through the unlawful use of gap-style liability offsets that reduce the stated UIM policy limits, as Westfield has done in denying UIM claims." Am. Compl. ¶ 108. The Amended Complaint alleges that "[i]n the future, it is believed, and therefore averred, that [] Westfield[] will continue to engage in this willful and wanton conduct in refusing to provide [UIM] coverage[.]" *Id.* ¶ 110. Given the request for forward-looking relief for a justiciable action under the MVFRL (whether Westfield misapplied coverage as gap), the Amended Complaint adequately pleads a declaratory judgment claim as to the proposed class. *See Trs. of Gen. Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, 527 F. Supp. 3d 722, 770 (E.D. Pa. 2021), *aff'd sub nom. Trs. of Gen. Assembly of Church of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, No. 21-1662, 2021 WL 6101254 (3d Cir. Dec. 21, 2021) (finding that the declaratory judgment action met both requirements because the facts were sufficiently concrete and could be resolved under the Declaratory Judgment Act).

---

[3] Although the Court declines to strike class allegations, the standards applied at the class certification stage differ from those at this stage.

However, Count I is dismissed as to the Engleharts as duplicative of their breach of contract claim in Count II. "Courts generally decline granting declaratory relief when the claim for declaratory judgment is entirely duplicative of another claim in the cause of action." *Butta v. GEICO Cas. Co.*, 400 F. Supp. 3d 225, 233 (E.D. Pa. 2019)). Courts have held that where a breach of contract claim for insurance benefits is denied, a duplicative declaratory judgment claim is subject to dismissal. *See Morris v. Am Nat'l Ins. Corp.*, No. 12-2236, 2015 WL 4092393, at *8 n.7 (M.D. Pa. Jul. 7, 2015). Further, a claim is duplicative where "adjudication of the latter will necessarily require resolution of the former." *In re Lincoln National COI Litig.*, 269 F. Supp. 3d 622, 640 (E.D. Pa. 2017).

Here, the primary distinction between the Engleharts' declaratory judgment claim and their breach of contract claim is that the Engleharts also alleged a class in their declaratory judgment claim. Yet, the Engleharts' declaratory judgment claim in Count I is remarkably similar (if not nearly identical) to the Engleharts' breach of contract claim in Count II. For example, the declaratory judgment claim alleges that "[n]otwithstanding [Pennsylvania law], in the present matter, the defendant, Westfield, has improperly denied UIM benefits by applying liability credits against the UIM policy limits, rather than against the total damages sustained." Am. Compl. ¶ 115. Similarly, the breach of contract claim alleges that "[t]he denial of [UIM] coverage to [the Engleharts], by reason of [Westfield's] applying liability credits against the UIM policy limits, rather than against the total damages sustained," violated Pennsylvania law. *Id.* ¶ 155. Both claims require investigation into Westfield's alleged misapplication of the Engleharts' policy and will ultimately require double adjudication of the same question: whether Westfield improperly applied coverage as gap, not excess. These claims are redundant, and concerns of judicial economy lead the Court to dismiss the Engleharts' declaratory judgment

claim. *See Weir v. Progressive Advanced Ins. Co.*, No. 25-654, 2026 WL 184242, at *5 (M.D. Pa. Jan. 23, 2026) (dismissing a declaratory judgment claim because "the plaintiff's breach of contract claim and his declaratory judgment claim are duplicative; both claims are premised on the plaintiff's assertions that he is owed insurance benefits and coverage for the damage to his vehicle"); *see also Smithkline Beecham Corp. v. Cont'l Ins. Co.*, No. 04-2252, 2004 WL 1773713, at *2 (E.D. Pa. Aug. 4, 2004) ("Hence, because Smithkline's breach of contract claims require resolution of the same issues raised in Smithkline's declaratory judgment claims and because Smithkline can be afforded full relief on its breach of contract claims, and will, therefore, suffer no prejudice from the dismissal of its declaratory judgment claims, the Court will decline to entertain Smithkline's claims for declaratory judgment."). The Engleharts' declaratory judgment claim cannot stand alone and is duplicative of their breach of contract claim.

The Court dismisses the Engleharts' declaratory judgment claim in Count I but does not dismiss the class claims in Count I.

**C. Breach of Contract—Underinsured Motorist Benefits**

The Court declines to dismiss the Engleharts' breach of contract claim as it relates to the difference between "gap" and "excess" coverage. The Engleharts' claim, in relevant part, is that Westfield denied "underinsured motorist coverage to the plaintiffs . . . by reason of applying liability credits against the UIM policy limits, rather than against the total damages sustained, is in direct violation of the specific terms and provisions of the MVFRL." Am. Compl. ¶ 155; *see also id.* ¶¶ 57–58 (alleging that UIM coverage under the MVFRL constitutes excess coverage, not gap coverage). Under Pennsylvania's UIM excess coverage regime, "[t]he insured must be permitted to 'recover [UIM] benefits until his policy limits are reached or he is fully

compensated for his damages, whichever comes first.'" *Costa v. Progressive Preferred Ins. Co.*, No. 16-74, 2016 WL 3220515, at *4 n.4 (W.D. Pa. June 10, 2016) (quoting *N. River Ins. Co. v. Tabor*, 934 F.2d 461, 464 (3d Cir. 1991)). Reciprocally, gap coverage bridges "the gap between the tortfeasor's liability limits and the injured person's liability limits[.]" *Gittelmacher*, 664 F. Supp. 3d at 615.

In this case, the Engleharts state a breach of contract claim based on Westfield applying gap coverage. Norton's letter provided Westfield's understanding that "liability offsets apply" in the amount of $692,000 for Mr. Englehart and $173,000 for Ms. Englehart, which Norton termed "liability credit[s]." Am. Compl. ¶ 55; *see also* Ex. D at 1. Norton added that, "[i]n accordance with Pennsylvania law, these credits are applied to reduce the available UIM coverage. As both credits meet or exceed the applicable UIM limit of $200,000 per person, no UIM benefit is payable under the terms of the Westfield policy." *Id.* At this early stage of the case, it appears that Westfield considered whether liability offsets applied with regard to the tortfeasor's insurance payment, and then considered the Engleharts' insurance policy, without considering the amount of damages as they would be required to when applying coverage as excess. Such allegations appear to resemble gap coverage, which is not permitted under Pennsylvania law. The Engleharts' allegations are thus sufficient to state a claim for breach of contract based upon Westfield's application of gap coverage. *See Backmeier*, 287 A.3d at 943 (citing *Generette*, 957 A.2d at 1186 n.12) (providing an example of how courts apply gap coverage and excess coverage under Pennsylvania law).

**D. Breach of Contract—Implied Duty of Good Faith and Fair Dealing**

The Engleharts fail to state a claim for breach of the implied duty of good faith and fair dealing. The Engleharts allege that Westfield breached its implied duty of good faith and fair

dealing in the policy "by refusing to make available UIM benefits to the [Engleharts], . . . , based upon an improper setoff of the tortfeasor's liability payments against the policy's UIM limits[.]" Am. Compl. ¶ 172. Also, the Engleharts recite the numerous ways Westfield acted in bad faith, including, but not limited to: "refusing to provide underinsured motorist benefits;" "misapplying liability credits against UIM policy limits rather than against total damages;" and "failing to properly and fairly evaluate the UIM claims of the [Engleharts.]" *Id.* ¶ 174; *see also id.* ¶ 193 (making the same allegations in the Engleharts' statutory bad faith claim). The Engleharts' claim fails for two reasons: (1) they cannot bring separate claims for both breach of contract and breach of the implied duty of good faith and fair dealing, and (2) their allegations of breach of good faith and fair dealing are identical to their statutory bad faith claim.

First, the Engleharts cannot bring separate claims for breach of contract and breach of the implied duty of good faith and fair dealing. The Engleharts do not clearly plead their claim. Although they appear to include their breach of the implied duty of good faith and fair dealing claim within their breach of contract claim, they pleaded the implied duty of good faith and fair dealing claim under its own heading. *See id.* ¶¶ 158–177. "[U]nder Pennsylvania law, the implied covenant of good faith does not allow for a cause of action separate and distinct from a breach of contract claim." *Burton*, 707 F.3d at 432. Further, "Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim." *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011) (citing *LSI Title Agency*, 951 A.2d at 391). "Moreover, applying Pennsylvania law, several courts have held that, where the plaintiff alleges that the defendant breached its duty of good faith and fair dealing by denying first party benefits under an

insurance policy, said claim is subsumed by the plaintiff's breach of insurance contract claim premised on the same conduct." *Simmons*, 788 F. Supp. 2d at 409.

Here, if the Engleharts intend to bring a separate claim for breach of the implied duty of good faith and fair dealing, such a claim would be duplicative of their breach of contract claim and therefore could not state a claim. Therefore, if the Engleharts intended to plead the claim independently, the Court dismisses the claim for breach of the implied duty of good faith and fair dealing as duplicative of their breach of contract claim.

Even if the Engleharts do not plead the breach of the implied duty of good faith and fair dealing claim independently, the allegations in that claim are identical to the allegations comprising their statutory bad faith claim. *Compare* Am. Compl. ¶ 174(a)–(r) *with* ¶ 193(a)–(r). In both paragraphs, the Engleharts allege that Westfield acted in bad faith by "refusing to provide underinsured motorist benefits;" "misapplying liability credits against UIM policy limits rather than against total damages;" and "failing to properly and fairly evaluate the UIM claims of [the Engleharts][.]" *Id.* "In examining the implied duty of good faith in Pennsylvania, the Third Circuit has held that "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'" *St. Clair v. State Farm Fire & Cas. Co.*, No. 15-0538, 2015 WL 2118975, at *3 (E.D. Pa. May 6, 2015) (quoting *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91–92 (3d Cir. 2000)); *see also Soldrich v. State Farm Fire & Cas. Co.*, No. 15-1438, 2015 WL 7568442, at *2 (E.D. Pa. Nov. 25, 2015) (dismissing a claim for breach of the implied duty of good faith and fair dealing claim when it was pleaded identically to the statutory bad faith claim). Here, the Engleharts' allegations of breach of the implied duty of good faith and fair

dealing claim are identical to their allegations of statutory bad faith. The Engleharts may only proceed with their statutory bad faith claim.

Therefore, the Court dismisses the breach of the implied duty of good faith and fair dealing claim in Count II.

**E. Statutory Bad Faith**

The Engleharts' statutory bad faith claim likewise fails to state a claim. The Amended Complaint alleges that Westfield acted in statutory bad faith "by refusing to provide UIM benefits to the [Engleharts]." Am. Compl. ¶ 190. The Engleharts also recite the numerous ways Westfield acted in bad faith, including, but not limited to, "refusing to provide underinsured motorist benefits;" "misapplying liability credits against UIM policy limits rather than against total damages;" and "failing to properly and fairly evaluate the UIM claims of the [Engleharts.]" *Id.* ¶ 193. There are numerous problems with these allegations. Notably, they are conclusory. *See Smith v. State Farm Mut. Auto. Ins. Co.*, 506 F. App'x 133, 136 (3d Cir. 2012) (holding that conclusory allegations without supporting facts fail to state a bad faith claim). Here, the Engleharts allege no facts showing that Westfield lacked a reasonable basis for denying coverage or that Westfield knew or recklessly disregarded a lack of reasonable basis for denial. In addition, the provided exhibits undermine their allegations. Finally, the Engleharts do not provide adequate allegations of their damages to support their challenge to the reasonableness of the settlement amount.

Initially, the Engleharts do not plausibly plead how Westfield failed to properly and fairly evaluate and investigate their claims. For their alleged facts, the Engleharts set forth conclusory, bare-bones allegations stating that, "Westfield failed and/or refused to commence any meaningful investigation or evaluation of the underinsured motorist claims of its insured," with

no detail as to how the investigation was flawed. Am. Compl. ¶ 49. Further, the Engleharts allege that Westfield "failed and/or refused to request additional records, obtain updated diagnostic studies, conduct an in-person interview, request an examination under oath, or obtain an independent medical examination. . ." *Id.* ¶ 50. Upon the Court's review of the Amended Complaint, the Engleharts do not allege any facts about Westfield's investigation at all, "let alone actions from which the Court can infer a bad faith claim." *Mozzo v. Progressive Ins. Co.*, No. 14-5752, 2015 WL 56740 (E.D. Pa. Jan. 5, 2015). *See also Soldrich*, 2015 WL 7568442, at *4 (dismissing a bad faith claim where the plaintiff alleged that the defendant "fail[ed] to complete a prompt and thorough investigation of Plaintiff's claim" and "fail[ed] to promptly provide a reasonable factual explanation of the basis for the denial of Plaintiff's claim" but did not provide factual support for the claim); *see also Atiyeh v. Nat'l Fire Ins. Co. of Hartford,* No. 07-4798, 2010 WL 3825708, at *6 (E.D. Pa. Sept. 27, 2010) (finding that the plaintiff's allegations that the defendant insurance company "(1) falsely and fraudulently represented that plaintiff had not performed routine maintenance on the premises; (2) unreasonably refused to indemnify plaintiff for his loss; and (2) breached its duty of good faith and fair dealing by: (a) failing to conduct a reasonable investigation, (b) denying benefits to plaintiff without a reasonable basis, (c) knowingly or recklessly disregarding the lack of a reasonable basis to deny plaintiff's claim, or (d) asserting policy defenses without a reasonable basis" were conclusory and failed to state a bad faith claim); *see also Clapps v. State Farm Ins. Co.*, 447 F. Supp. 3d 293, 300 (E.D. Pa. 2020) (dismissing a bad faith claim for failure to plead facts as to the defendant's failure to investigate). Here, the Engleharts' allegations are no clearer or more fact-specific than the allegations in *Soldrich*, *Atiyeh*, or *Clapps*, which those courts dismissed. Hence, the Engleharts' allegations are conclusory and thus insufficient to state a bad faith claim.

Moreover, the Engleharts attached exhibits to their Amended Complaint that call into question their allegations that Westfield failed to investigate their claims. The Engleharts acknowledged that they provided Westfield with medical records and documentation of economic losses. *See* Am. Compl. ¶¶ 49–52. Additionally, Exhibit D to the Amended Complaint shows Westfield's reasons for denying Mr. Englehart's claim, including discussion of his injuries:

> Mr. Englehart's injuries, including fractures of the 2nd and 4th metacarpals in the dominant hand, required open reduction internal fixation. His recovery included post-operative follow-up, with no documented physical therapy and resolution of symptoms reported by March 2024. An [Independent Medical Exam] noted group and pinch weakness of 50%, though his treating orthopedist did not document such residual impairment. Future treatment was speculative. The liability settlement of $692,000 sufficiently compensates for the injury sustained.

Ex. D. at 1.

Exhibit D also provides Westfield's reasons for rejecting Ms. Englehart's claim:

> Ms. Englehart experiences soft-tissue injuries including a right shin hematoma, left knee pain, and temporary psychological distress. She returned to part-time work six weeks post-accident, then elected to retire approximately five months later. While we acknowledge her temporary limitations and treatment, the claimed losses—including emotional distress and lost earnings—are reasonably accounted for within the $173,000 liability credit previously received.

*Id.* at 2. These exhibits undermine the Engleharts' allegations because they detail Westfield's reasons for denying their claims. The exhibits also contain language about how Westfield "remain[ed] open to reviewing" additional documentation about the Engleharts' injuries and subsequent claims. *Id.* Although the Engleharts dispute Westfield's assessment of their claims, they do not provide the medical records to this Court that they provided to Westfield. The Court thus has no "factual benchmark" to find whether Westfield either failed to investigate or whether the investigation was unreasonable. *Juhasz v. USAA Cas. Ins. Co.*, No. 25-7154, 2026 WL 1008110, at *3 (E.D. Pa. Apr. 14, 2026); *see also McConnell v. Nationwide Mut. Ins. Co.*, No.

21-4523, 2022 WL 970671, at *2 (E.D. Pa. Mar. 31, 2022) (dismissing an amended complaint for failing to "describe any type of medical treatments undergone or costs incurred, nor does it detail how much, if any, time [the plaintiff] missed from work"). Without providing specific facts as to why or how Westfield's investigative process was flawed, and by offering exhibits providing Westfield's explanation of its rejection, conflicting with the aforementioned allegations, the Engleharts fail to plausibly plead that Westfield failed to evaluate and investigate their claims. *See Castillo v. Progressive Ins.*, No. 19-1628, 2021 WL 963478, at *5 (M.D. Pa. Mar. 15, 2021) (finding no bad faith after acknowledging that the claims representative independently reviewed and took notes about the plaintiff's medical records "before communicating his preliminary findings and the [] settlement offer to [the plaintiff's] legal team").

To the extent the Engleharts challenge the reasonableness of the settlement amount, *see* Am. Compl. ¶ 193(a), (l), (m), they fail to provide factual allegations regarding their damages. "[U]nreasonably low settlement offers may offer evidence of bad faith, and such a claim may be supported by further evidence of lost wages and medical expenses." *Pyatt v. State Farm Mut. Auto. Ins. Co.*, No. 25-27, 2025 WL 870132, at *2 (E.D. Pa. Mar. 20, 2025) (citation omitted). However, the plaintiffs must demonstrate how the insurer's offer (or lack thereof) is unreasonable in light of their needs. *See id.*; *see also Carr v. Travelers Home and Marine Ins. Co.*, 700 F. Supp. 3d 288, 296 (E.D. Pa. 2023) ("[B]ad faith is not present merely because an insurer makes a low but reasonable estimate of an insured's damages.") (quoting *Smith*, 506 F. App'x at 136). Failure to provide "quantitative data" that indicates the level of compensation required by the plaintiff makes allegations of objective unreasonableness insufficient. *Juhasz*, 2026 WL 1008110, at *3 (dismissing a bad faith claim because "beyond pleading what her injuries were, and that she lost earnings and her overall earning capacity, [the plaintiff did] not

provide an amount of lost wages or medical expenses" to explain why the settlement offer was unreasonable). More than conclusory allegations are required for the Court to "make a plausible inference that the Defendant knew or reckless disregarded its lack of a reasonable basis for denying benefits." *Pasqualino v. State Farm Mut. Auto. Ins. Co.*, No. 15-77, 2015 WL 3444288, at *5 (E.D. Pa. May 28, 2015).

Here, the Engleharts do not allege any amount of damages sought in their Amended Complaint but merely allege that Westfield did not fully compensate them and refused to provide any UIM benefits to cover such illusive damages. Without such an amount, the Court cannot infer whether Westfield's refusal to provide benefits was (or was not) reasonable. Since the Engleharts fail to quantify their damages, the Amended Complaint fails to adequately plead bad faith for failure to offer a reasonable settlement amount. *See Hampton v. Progressive Ins. Co.*, 734 F. Supp. 3d 391, 394–397 (E.D. Pa. 2024) (requiring a plaintiff to allege sufficient facts for a court to determine if an offer is reasonable); *Clapps*, 447 F. Supp 3d at 299 (requiring a plaintiff to plead underlying facts about the requested damages for the court to make a plausible inference of reasonableness).

Taken together, the Engleharts' allegations amount to nothing more than a dispute over the value of their claims. Westfield's refusal to provide coverage and dispute over valuation is not itself proof of bad faith. *See McDonough v. State Farm Fire & Cas. Co.*, 365 F. Supp. 3d 552, 558 (E.D. Pa. 2019) (observing that an insurance company's failure to accede to a demand for the policy limit cannot, without facts, amount to a bad faith claim) (citing *Smith*, 506 App'x at 137); *see also Litman v. GEICO Cas. Co*., No. 22-4530, 2023 WL 8091982, at *3 (E.D. Pa. Nov. 21, 2023) ("It is not unusual that the parties would disagree over the value of [the p]laintiffs' UIM claim, and GEICO's failure to offer [the p]laintiffs[] their demanded policy limits cannot,

without more, amount to bad faith.”). Rather, the Engleharts must “describe who, what, where, when, and how the alleged bad faith conduct occurred.” *Mattia v. Allstate Ins. Co.*, No. 14-2099, 2014 WL 2880302, at *4 (E.D. Pa. June 24, 2014) (citation omitted).

The Court dismisses Count III.

**F. Amendment**

The Court dismisses Count III of the Amended Complaint without prejudice to permit the Engleharts to provide factual support for their statutory bad faith claim. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that a court should allow amendment of a complaint unless doing so would be inequitable or futile); *see also Juhasz*, 2026 WL 1008110, at *4 (dismissing a bad faith claim without prejudice). However, the Court dismisses the Engleharts’ theory of breach of the implied duty of good faith and fair dealing with prejudice because amendment would be futile. *See St. Clair*, 2015 WL 2118975, at *3–4 (dismissing a breach of the implied duty of good faith and fair dealing with prejudice because the plaintiff could not bring a stand-alone claim for breach of the implied duty of good faith and fair dealing and the plaintiff made the same allegations in a statutory bad faith claim). The Court also dismisses the Engleharts’ declaratory judgment claim in Count I with prejudice because it is duplicative of their breach of contract claim in Count II. *See Smithkline*, 2004 WL 1773713, at *3 (dismissing a declaratory judgment claim with prejudice as duplicative of a breach of contract claim).

## V. CONCLUSION

For the foregoing reasons, the Court grants the Motion to Dismiss in part but denies the Motion to Dismiss in part. The Court does not strike the class allegations from Count I of the Amended Complaint given that the case is at an early stage and the class allegations are not facially deficient. The Court also declines to dismiss Count I of the Amended Complaint as to

the class claim, but dismisses the Engleharts' declaratory judgment claim in Count I. The Court dismisses Count III of the Amended Complaint without prejudice. The Court dismisses Count II of the Amended Complaint in part as to the theory of breach of the implied duty of good faith and fair dealing but does not dismiss the allegations in Count II that Westfield applied gap coverage, rather than excess coverage.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge